UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREAT MILL ROCK LLC, CHRISTOPHER
WHALEN, and ADI PEKMEZOVIC

|                                          |
| Plaintiffs,                              |

-against-

STELLEX CAPITAL MANAGEMENT LP,
STELLEX CAPITAL MANAGEMENT LLC, and
J. ANTHONY BRADDOCK

|                                          |
| Defendants.                              |

No. 20 Civ. 3056 (CM)

---

**DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DIMISS**

McMahon, C.J.:

Plaintiffs Great Mill Rock LLC ("GMR"), Christopher Whalen ("Whalen"), and Adi Pekmezovic ("Pekmezovic") bring this action alleging claims for unfair competition under 15 U.S.C. § 1125(a) ("Lanham Act"), common law trademark infringement and unfair competition, as well deceptive trade practices, false advertising, conversion, fraudulent inducement, and tortious interference with prospective economic advantage under New York law. Plaintiffs also seek declarations of ownership and non-infringement of related trademarks and copyrights.

Plaintiffs allege that Defendants Stellex Capital Management LP and Stellex Capital Management LLC (collectively, "Stellex") have misappropriated their intellectual property in the form of trademarks and website text, and that they and Defendant J. Anthony Braddock ("Braddock") interfered with Plaintiffs' business dealings by withholding their mail, emails, and electronic files. (Dkt. No. 1 at ¶¶ 1-2 ("Compl.").) Before the court is Defendants' Fed. R. Civ. P.

12(b)(6) Motion to Dismiss each of the complaint's eleven counts for failure to state a claim. (Defs.' Mot. to Dismiss, Dkt. No. 24.)

Defendants' motion to dismiss is DENIED. I decline to convert the motion into a motion for summary judgment at this juncture. However, I am giving the parties 120 days to complete all discovery – at which point I expect there may be a motion for summary judgment by someone – or perhaps by everyone.

## BACKGROUND

### I.  Parties

Plaintiffs Christopher Whalen and Adi Pekmezovic are members and managing partners of GMR. (Compl. ¶¶ 4-5.) Plaintiff GMR is a private investment firm. Whalen and Pekmezovic founded GMR in August 2018. (*Id.* ¶ 3.)

Defendant Stellex Capital Management LP is a private equity firm, of which Defendant Stellex Capital Management LLC is the general partner. (*Id.* ¶¶ 6-7.) Defendant J. Anthony Braddock serves as the chief financial officer and chief compliance officer of Stellex Capital Management LP. (*Id.* ¶ 8.)

### II.  Factual Background

*The Negotiations*

In or about the summer of 2017, Whalen and Pekmezovic began negotiating with Stellex managing partners Michael Stewart and Raymond Whiteman about managing some new private investment funds that Stellex was planning to raise ("the Proposed Funds"). (*Id.* ¶ 16.) Stewart and Whiteman repeatedly assured Whalen and Pekmezovic that Stellex had investors lined up for this new venture. (*Id.* ¶¶ 16-18.)

In early 2018 Whalen and Pekmezovic agreed to leave their current positions as partners at a different investment firm to lead and manage the Proposed Funds. (*Id.* ¶¶ 16-19, 22.) They resigned on February 23, 2018. (*Id.* ¶ 22.)

Around the same time Whalen and Pekmezovic were negotiating with Stellex – late 2017 and early 2018 – they were planning to open their own investment fund under the name "Mill Rock Capital." (*Id.* ¶ 20.) They allege that they independently created the trademarks MILL ROCK,



MILL ROCK CAPITAL, and  ("the Trademarks") during this time. (*Id.*) Plaintiffs allege that, from the beginning of their negotiations, Pekmezovic insisted that he and Whalen (1) control the branding and marketing for the Proposed Funds, (2) own any associated intellectual property, and (3) pick their own team. (*Id.* ¶ 26.) Stewart allegedly agreed to this arrangement; and he and Whiteman reiterated their agreement over the course of the negotiations and throughout the parties' business relationship. (*Id.*)

After Whalen and Pekmezovic resigned from their former jobs, on or about March 1, 2018 they each signed a memorandum of understanding ("MOU") with Stellex. The MOU related to the Proposed Funds, which at that time were to be named "Adirondack I," "Adirondack II," and so forth. These new funds were to be managed by entities named Adirondack Credit Management LP and Adirondack Credit LLC. Whalen and Pekmezovic were to lead and manage the Proposed Funds through Adirondack Credit Management LP. (*Id.* ¶ 23.)

The MOU's stated "intent" was "to outline the basic duties, terms, conditions and other matters" of Plaintiffs' roles in the Proposed Funds. (Dkt. No. 25, Coffey Decl. at Exs. B, C ("MOU") 1.) The MOU provided that Stellex would "retain" Whalen and Pekmezovic to "lead and manage long only credit funds" – i.e., the Proposed Funds – "on behalf of Stellex and certain

investors" (Compl. ¶ 20; MOU 1), and that these funds would be structured under Adirondack

Credit Management LP (*id.* 1, 3-6). Notably, the MOU leaves open the "day-to-day scope of [the

Executives'] authority to be mutually agreed upon." (*Id.* 1.)

In addition to a strategic directive for the Proposed Funds, the MOU also sets out "Principal

Terms of Employment for Each Executive," including Whalen and Pekmezovic's formal roles as

partners and managing directors of the Adirondack entities, their salary, bonus and profit sharing

structures and health benefits, all to begin no later than May 23, 2018. (*Id.* 1-3.) Provisions relating

to "Termination," "Severance," and "Non-Competition; Restrictions" remained "to be provided."

(*Id.* 3.)

The MOU also lists "Primary Responsibilities & Duties of Executives," which foresaw that

Whalen and Pekmezovic would have "significant latitude" in staffing decisions for the Proposed

Funds, and that Stellex would provide "operations personnel" and "back-office and administrative

infrastructure" for their work. (*Id.* 3-4.) Whalen and Pekmezovic were to be responsible for the

"[d]evelopment of branding and messaging plans" for the funds, which was to include "[n]aming,

logo and other creative works," "website construction," and "PR and media plans." (*Id.* 3.) This

work was to be subject to the approval of Adirondack Capital Management LP's "Investment

Committee," on which Whalen and Pekmezovic were to serve, together with Stellex Managing

Partners Whiteman and Stewart. (*Id.* 1, 3-4.)

Plaintiffs argue that Whalen and Pekmezovic's relationship with Stellex was that of a joint

venture. The MOU plainly describes the arrangement as an employment relationship, and

Defendants have proffered W-2 forms listing Stellex as Whalen and Pekmezovic's employer during 2018 and 2019. (Dkt. No. 25, Decl. Coffey at Exs. D, E.)[1]

As noted above, several terms of the MOU were left open, and Plaintiffs allege that the document was not a final and binding agreement. The MOU expressly stated, "Final terms will be incorporated in documentation mutually agreed to by Stellex and the Executives," (MOU 1) and the MOU does not contain a merger clause. Significantly, everything in the MOU related to Adirondack and the Proposed Funds that were to be raised by Stellex – nothing else. The MOU does not mention anything about the ownership of intellectual property, and it makes no reference to anything called Mill Rock.

After signing the MOU, the parties continued their negotiations concerning the Proposed Funds. (Compl. ¶¶ 24-25.) They allegedly reached certain oral interim agreements (the "Oral Agreement") regarding both the Proposed Funds and other, independent investment activities. (*See id.* ¶¶ 27-36.)

Regarding the Proposed Funds, Whalen and Pekmezovic allege that they orally agreed to help establish the Proposed Funds, to grant Stellex and limited and revocable license to use the Trademarks under their supervision, and use the "Mill Rock" brand in connection with the Proposed Funds. (*Id.* ¶¶ 26, 28-30.) In exchange, Stellex allegedly agreed to pay Whalen and Pekmezovic a fee, provide them with administrative support and office space, and give them an ownership stake in the entity that would manage the Proposed Funds. (*Id.*)

Regarding the independent investment activities, the parties agreed that Whalen and Pekmezovic could independently identify, diligence, and complete other investments using the

---

[1] These extraneous documents, which contradict allegations in the complaint, are not considered on a motion to dismiss.

MILL ROCK brand and Trademarks, for which Stellex would cover reasonable out-of-pocket expenses (to be reimbursed by deal proceeds in the event that a deal closed). (*Id.* ¶ 31.) In exchange, Stellex would have an opportunity to invest in any deals that Whalen and Pekmezovic independently sourced. (*Id.*)

The Oral Agreement was to remain in effect while the parties continued to negotiate the terms related to the Proposed Funds, with the intention of eventually reaching a definitive and superseding agreement. (*Id.* ¶ 32.)

On or about March 15, 2018, Stellex changed the names of the Proposed Funds entities to incorporate the MILL ROCK mark – i.e., Stellex reincorporated Adirondack Credit Management LP as Mill Rock Capital Management LP, and changed Adirondack Credit LLC to Mill Rock Capital Management LLC. (*Id.* ¶ 35.)

On or about April 30, 2018, Whalen and Pekmezovic began working with Stellex. They allege that they did so pursuant to the terms of the Oral Agreement, not the MOU. (*Id.* ¶ 36.)

The complaint alleges that the parties never memorialized the Oral Agreement in a signed writing. (*Id.* ¶ 33.)

*GMR's Incorporation and Trademarks*

On August 13, 2018, Whalen and Pekmezovic incorporated GMR to handle their independently-sourced investments – the ones allegedly anticipated by the Oral Agreement – while negotiations about the Proposed Funds dragged on. (*Id.* ¶¶ 38.) Plaintiffs allege that Whalen and Pekmezovic fully own and control GMR. (*Id.*) They further allege that Whalen and Pekmezovic formed GMR with the full knowledge and support of Stellex, which provided GMR with administrative support, incorporation fees, and legal fees for the services of Greenberg Traurig,

LLP ("Greenberg"). (*Id.* ¶¶ 38-41.) Greenberg allegedly advised and represented Plaintiffs in connection with GMR's incorporation and their trademark applications.

On August 16, 2018, Whalen and Pekmezovic arranged to register the Trademarks with the United State Patent and Trademark Office ("USPTO") in the name of GMR. (*Id.* ¶ 42.) GMR filed intent-to-use trademark applications for the Trademarks. (*Id.*) Defendant Braddock approved and agreed to GMR filing the trademark applications. (*Id.* ¶ 44.) Greenberg advised and represented GMR through Barry R. Horwitz ("Horwitz"), who Plaintiffs gave Power of Attorney with respect to the USPTO proceedings. (*Id.* ¶ 43.) Stellex paid for these services. (*Id.* ¶¶ 44-45.)

Horwitz and Greenberg allegedly advised Plaintiffs to protect the Trademarks by forming a website for GMR. (*Id.* ¶ 49.) Whalen, on behalf of GMR, prepared a draft of the text for the website ("the Website Text"). (*Id.*) On August 12, 2019, Horwitz reviewed the Website Text and ensured Plaintiffs that their USPTO applications would be registered after the site was published. (*Id.*) After GMR was incorporated, the Website Text was published at millrock-cap.com on or about August 16, 2019. (*Id.* ¶ 68.)

Plaintiffs insist that, throughout this process, Stellex never suggested that it owned the Trademarks, and that Whalen and Pekmezovic continually held them out to be their exclusive property. (*Id.* ¶ 50.)

*GMR's Deals*

Between October 2018 and July 1, 2019, Plaintiffs completed three investment transactions under the GMR entity – doing business as "Mill Rock Capital" – largely for the benefit of Stellex. (*Id.* ¶¶ 51-58.) The complaint alleges that GMR's October 2018 deal involving Grammar Industries, or similar "financial services" undertaken that month "in connection with the Trademarks," constituted their first use in commerce. (*Id.* ¶¶ 48, 52.) GMR proceeded to close two

more deals: one with Cisco in February 2019, and one with Venture Metals on July 1, 2019. (*Id.* ¶¶ 54, 55.) Media reporting on these deals referred to GMR as "Mill Rock Capital." (*Id.* ¶ 59.)

Plaintiffs specifically allege that these three deals were not part of the Proposed Funds and were not subject to the terms of the MOU; rather, Plaintiffs alleged that they completed these deals pursuant to the Oral Agreement. (*Id.* ¶¶ 56-57.) As contemplated in the Oral Agreement, Plaintiffs offered to let Stellex invest in each of these opportunities, and Stellex agreed to invest in two of the three deals. (*Id.* ¶¶ 52-55.) Notably, Plaintiffs specifically allege that these deals were not executed in the context of committed investment funds from the Proposed Funds; Stellex itself, not the Funds, invested in the Grammar and Cisco deals through its own, preexisting investment fund, and Plaintiffs raised all of the money for the Venture Metals deal from other sources. (*Id.* ¶¶ 52-56.) Additionally, unlike the MOU which contemplated that the Proposed Funds would be "long only credit funds focused on investing primarily in . . . debt obligations" in each of these deals, investors took controlling equity stakes in or controlled the board of directors of the target companies – i.e., the three deals were equity/control deals and not credit/debt deals. (*Id.* ¶ 56; MOU 1.)

Stellex personnel purportedly confirmed the parties' understanding that Plaintiffs' deals were not related to the Proposed Funds. For example, Stewart, a Stellex managing partner, stated in an August 2, 2019, meeting that the deals were not consistent with the "Adirondack strategy" contemplated in the MOU, particularly since they were not "credit strategy" transactions. (Compl. ¶ 56; MOU 5.) Additionally, although the MOU outlined term terms of the Adirondack portfolio and the Proposed Funds' investments, the parties negotiated Stellex's investment in two of the deals from scratch, rather than relying on the terms of the MOU. (*See id.*; Compl. ¶¶ 56-57.)

*The Parties' Relationship Breaks Down*

In June 2019, Stellex informed Whalen and Pekmezovic that the largest investor it had lined up would not be investing in the Proposed Funds. As a result, Stellex was no longer interested in raising them. (*Id.* ¶ 62.) Stellex reaffirmed its intention to abandon the Proposed Funds in an August 2, 2019, meeting. At that meeting Stellex allegedly urged Whalen and Pekmezovic to shut down the Mill Rock brand and accept employment with Stellex, so as not to "confuse the market with simultaneous offerings." (*Id.* ¶ 63.) Whalen and Pekmezovic declined Stellex's offers and continued work on their own under the GMR rubric. (*Id.* ¶ 65.)

On August 16, 2019, Stellex told Whalen and Pekmezovic that it was terminating their relationship and defunding Mill Rock Capital Management LP. (*Id.* ¶ 66.) Whalen emailed Braddock, Whiteman and Stewart that same day, directing Stellex to cease using the Trademarks – thereby terminating the alleged oral license – and asserting GMR's ownership of them. (*Id.* ¶ 67.) Braddock countered with an assertion of Stellex's ownership of the Trademarks on August 19, 2019. (*Id.* ¶ 69.)

On August 28, 2019, Horwitz – allegedly at the direction of Stellex and Braddock – attempted to withdraw and abandon GMR's trademark applications by filing "express abandonments" with the USPTO in the name of GMR. (*Id.* ¶ 71.) Horwitz then filed identical trademark applications in Stellex's name on the same day – allegedly so that Stellex could to take credit for Whalen and Pekmezovic's successful investment deals under the Mill Rock Capital name. (*Id.* ¶¶ 72-74.) Upon learning of Horwitz's actions on September 2, 2019, Whalen and Pekmezovic immediately revoked Horwitz's Power of Attorney and filed new applications for the Trademarks. (*Id.* ¶ 75.) They also filed letters on September 9 with the USPTO protesting Stellex's

applications for the same marks, alleging misconduct on the part of Stellex, Greenberg, and Horwitz, and requesting the reinstatement of Plaintiffs' initial applications. (*Id.* ¶ 77.)

In a letter dated September 13, 2019, Horwitz reasserted Stellex's ownership of the Trademarks and Website Text, demanded that Plaintiffs cease using them and take down their website, and claimed that Stellex had only recently become aware of GMR's existence. (*Id.* ¶¶ 78-79.) Whalen and Pekmezovic responded on September 27, by demanding that Stellex cease its use of intellectual property, halt its USPTO applications, take down and turn over Stellex's millrockcap.com website, and disband Mill Rock Capital Management LP. (*Id.* ¶ 80.) Plaintiffs allege that Stellex has not responded to the substance of this letter. (*Id.* ¶ 82.)

As of the date the complaint was filed, both the millrockcap.com and stellexcapital.com websites display the MILL ROCK CAPITAL logo, and the latter website lists "MILL ROCK CAPITAL" under a heading labeled "Affiliates." (*Id.* ¶ 83.)

*The Present Dispute*

Plaintiffs allege that Stellex's efforts to withhold the Trademarks and Website Text have negatively impacted its business as GMR under the "Mill Rock Capital" name. (*Id.* ¶¶ 86-87.) GMR has 11 employees and has reviewed almost 100 transactions since August of 2019. (*Id.* ¶ 86.) Plaintiffs allege that Stellex has been making false assertions to the market and current and/or potential clients that Plaintiffs do not own the Trademarks and that Plaintiffs are infringing on Stellex's trademarks. (*Id.* ¶ 89.) Additionally, Stellex has allegedly cut Whalen and Pekmezovic off from their mail, digital files, and emails from during and after their working relationship, which Plaintiffs blame for missing out on two significant business opportunities, as well as ensuing fines, penalties, and distractions. (*Id.* ¶¶ 90-91.) Specifically, in August 2019, Stellex's purported

interference prevented Plaintiffs from consummating two deals with Cabot Corporation and Hub Folding Box Company, Inc. (*Id.* ¶¶ 91-92.)

As a result, Plaintiffs filed the present lawsuit, alleging numerous causes of action:

In Count I, Plaintiffs claim that Stellex's continued use of Plaintiffs' Trademarks constitutes unfair competition in the form of false designation of origin and false advertising under Section 43(a) of the Lanham Act.

Plaintiffs allege in Count IV[2] that Stellex's infringement of the Trademarks, misrepresentations as to their ownership, denial of access to Plaintiffs' files, and abandonments and re-filings of the USPTO applications constitute deceptive acts or practices in violation of New York General Business Law Section 349(h).

Plaintiffs allege in Count V that Stellex's conduct constitutes false advertising in violation of N.Y.G.B.L. § 350(e)(3).

Plaintiffs allege in Count VI that Stellex committed trademark infringement likely to cause confusion and unfair competition under New York common law.

Plaintiffs allege in Count VII that Stellex and Braddock's misrepresentations and misappropriation of Plaintiffs' intellectual property, denying Plaintiffs access to their files, and directing Greenberg to commit a breach of trust by filing the USPTO abandonments constitute common law unfair competition.

Plaintiffs allege in Count VIII that Stellex and Braddock's misappropriation of GMR's USPTO applications constitute common law conversion.

---

[2] Plaintiffs have withdrawn Counts II and III. (Pls.' Opp'n Defs.' Mot. Dismiss 25 n.17, Dkt. No. 30.)

In Count IX, Plaintiffs request a declaration of ownership and non-infringement of the Trademarks pursuant to the Declaratory Judgment Act.

In Count X, Plaintiffs seek a declaration of copyright ownership and non-infringement with regard to the Website Text pursuant to the Declaratory Judgment Act and the Copyright Act.

In Count XI, Plaintiffs allege that Stellex knowingly misrepresented its commitment to the Proposed Funds and their fundraising prospects in order to induce Whalen and Pekmezovic to leave their previous employment and enter a relationship with Stellex, amounting to fraudulent inducement.

In Count XII, Plaintiffs allege that Stellex's diversion of their mail and email, withholding their documents, and freezing their email accounts constitute common law conversion.

In Count XIII, Plaintiffs allege that by withholding their mail, email, and documents, and abandoning their USPTO applications in favor of Stellex's own applications, Stellex and Braddock damaged Plaintiffs' business and committed tortious interference with a prospective economic advantage.

Defendants move to dismiss all counts for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Mot. Dismiss, Dkt. No. 24.)

The motion is DENIED.

## DISCUSSION

### I.    Standard of Review

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint need only provide "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis in original) (quoting

*Conley v. Gibson*, 355 U.S. 41, 47, (1957)). A complaint that fails to state a claim upon which relief can be granted can be dismissed. Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This threshold "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In evaluating Plaintiffs' claims in light of this standard, the factual allegations in the complaint are taken as true, and all reasonable inferences are drawn in Plaintiffs' favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

## II.     Matter to be Considered

On a 12(b)(6) motion to dismiss, the court is limited to considering facts contained in the complaint, "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 352 F. Supp. 3d 265, 274 (S.D.N.Y. 2018) (citing *Hayden v. Cty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). A court can consider a document not incorporated by reference where a plaintiff "would have had actual notice as he drafted his complaint," *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 571 (S.D.N.Y. 2013) (citing *Cortex Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 38 (2d Cir. 1991)), and where the complaint "relies heavily upon in its terms and effect, thereby rendering the document integral" to it, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006)) (internal quotations

omitted). The Second Circuit has made clear that notice or possession of a document is not sufficient in the absence of "*reliance* on the terms and effect of a document in drafting the complaint." *Chambers*, 282 F.3d at 152 (emphasis original).

The complaint extensively describes the MOU and its terms, thereby incorporating it by reference; it can therefore be considered for the purposes of Defendants' motion to dismiss. (Compl. ¶¶ 23-26, 51, 56-57, 150.)

On the other hand, this court will not consider the W-2 forms proffered by Defendants in their motion papers. The complaint makes no mention of the forms, and Plaintiffs do not rely on them in shaping their claims. Defendants argue that the complaint necessarily "relies" on the W-2 forms, since they contradict other allegations of the complaint. (Defs.' Mem. Supp. Mot. Dismiss 4 n.2, Dkt. No. 26), but they cite no authority for the proposition that a document that allegedly contradicts some fact recited in a complaint is "integral" to the complaint, and this court is not familiar with any such authority. Both cases cited by Defendants are factually inapposite. *Teri v. Spinelli*, 980 F. Supp. 2d 366, 371–72 (E.D.N.Y. 2013) considers W-2 forms proffered by the plaintiff on a motion for summary judgment, not a motion to dismiss for failure to state a claim. And the W-2 forms at issue in *Tisone v. Berardino*, No. cv-16-167, 2016 WL 7404556, at *4 (W.D. Pa. Dec. 22, 2016) were attached to a response to a motion to dismiss by the plaintiff, who "expressly relie[d]" on them in his complaint to assert his employee status.

The W-2 forms cannot be considered without converting the present motion into one for summary judgment. *Chambers*, 282 F.3d at 152. This the court declines to do, there being many disputed issues of fact that must be explored on discovery.

III.    **Defendants' Motion to Dismiss is Denied.**

Defendants' principal argument is that all of Plaintiffs' trademarks claims (Counts I, IV, V, VI, VII, and IX) and their copyright claim (Count X) must be dismissed because Stellex owns the Trademarks and the Website Text, which were first used while Whalen and Pekmezovic were Stellex employees. Defendants assert that this argument prevails regardless of whether the Whalen and Pekmezovic were employed under the MOU or the interim Oral Agreement.

Defendants are wrong. At this stage, the court must accept all of Plaintiffs' well-pleaded factual allegations as true. The complaint pleads the existence of an Oral Agreement that governed the parties' relationship during the period while the terms of the arrangement contemplated in the MOU – i.e., those concerning the Proposed Funds – were being finalized and committed to writing. It also pleads the terms of that Agreement. If the text of the MOU (which the court can and does consider on this motion) were incompatible with the Oral Agreement that is pleaded in the complaint, there might be some basis for a motion to dismiss. But the MOU is entirely concerned with the Proposed Funds. It defines the Proposed Funds – the future Adirondack (later re-branded as Mill Rock) Credit Vehicles – as "ACV." (MOU 1.) Whalen and Pekmezovic's "position" relates exclusively to their work on the Proposed Funds; specifically: serving as a partner and managing director of Adirondack Credit LLC and Adirondack Credit Management LP (the two entities through which the Proposed Funds were to operate), as well as serving as a member of the Investment Committee and as an Approved Executive Officer as defined in the AVC limited partnership agreement. (*Id.* 1-2.) All of their duties revolve around the Proposed Funds, as outlined in two sections of the MOU: "Primary Responsibilities & Duties of Executives Prior to Final Closing of First ACV" and "Primary Responsibilities & Duties of Executives After Final Closing of First ACV." (*Id.* 3-6.)

The text of the MOU does not on its face bar the possibility of an oral agreement relating to matters other than the Proposed Funds (which Stellex never raised and ultimately declined to raise). And the alleged Oral Agreement relates in significant part to deals that were done completely outside of the Proposed Funds – deals of a different type than those contemplated for the Proposed Funds – in which Stellex independently invested. Notably absent from Whalen and Pekmezovic's job description in the MOU is anything obligating them, as employees of Stellex, to do anything other than work on the Proposed Funds on behalf of Stellex. The only reference to outside investments is in the Post-Closing section of the MOU: "Other Investing Activities: Subject to any prohibitions in ACV LPAs, the Executives shall have the same opportunities and rights afforded to them prior to final closing of the first ACV, " which seems to merely clarify that the limited partnership agreements associated with the Proposed Funds may limit their investment opportunities. (*Id.* 6.) The MOU itself contains no terms governing any investment activities by Plaintiffs other than the Proposed Funds. As noted above, it does not contain a non-compete that would have barred Plaintiffs, while in the employ of Stellex, from engaging in outside activities that were not inconsistent with the Proposed Funds (and the text of the MOU makes it clear that the parties contemplated entering into a negotiated form of non-compete that was never finalized). Finally, Stellex's alleged behavior in negotiating entirely new terms for the deals that Whalen and Pekmezovic did do, and in investing in two of those deals, is entirely inconsistent with the notion that the MOU governed anything other than the parties' relationship vis-à-vis the Proposed Funds, which were never raised.

The Oral Agreement did allegedly include a license for Stellex to use the Trademarks – which Plaintiffs allegedly own and created – in connection with the Proposed Funds, but that is also not inconsistent with the MOU, which does not mention anything about intellectual property

or its ownership. Defendants rely on the provision of the MOU that outlines Whalen and

Pekmezovic's "Branding" responsibilities: "Development of branding and messaging plans which

may include, but not be limited to:

> • Naming, logo and other creative works.
> • Website construction.
> • PR and media plans.

[Adirondack Credit LLC] approval required on all related Branding matters." (MOU 3-4.) But

unlike the agreements in the cases Defendants cite in support of their argument – *Manganaro*

*Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, No. 01-cv-0849, 2002 WL 1560789, at *6 (S.D.N.Y.

July 15, 2002) and *Youssef v. Halcrow, Inc.*, No. 11-cv-2283, 2011 WL 5244950, at *3 (S.D.N.Y.

Nov. 1, 2011), *aff'd*, 504 F. App'x 5 (2d Cir. 2012) – the MOU does not expressly assign Stellex

the right to use the disputed Trademarks. In fact, it says nothing at all about who owns any of the

brands that Plaintiffs might create.

As noted above, the MOU does use some terminology of employment. For example, it

states that Adirondack Credit Management LP "will directly employ the Executives" –

Pekmezovic and Whalen – "and all other Adirondack professionals." (MOU 1.) Additionally, it

lays out the "Principal Terms of Employment for Each Executive." (*Id.* 1-2.) However, this is in

no way inconsistent with Plaintiffs' operating a separate business that did deals not intended for

the Proposed Funds (for example, the kind of equity/control deals that Plaintiffs put together and

in which Stellex independently chose to invest). Even if Plaintiffs were Stellex employees, they

could still own the Trademarks. *See Dual Groupe*, 932 F. Supp. 2d at 574 (citing *Hawaii–Pacific*

*Apparel Group, Inc. v. Cleveland Browns Football Co. LLC*, 418 F. Supp. 2d 501, 506

(S.D.N.Y.2006)); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§

18:45.50, 18:58 (5th ed. 2020); *Floater Vehicle, Inc. v. Tryco Mfg. Co.*, 497 F.2d 1355, 1358

(C.C.P.A. 1974). I disagree with Defendants that the parol evidence rule bars proof of any prior oral agreement concerning the ownership of the Trademarks, both because the complaint alleges that the Oral Agreement was made subsequent to the signing of the MOU (i.e., it is not a "prior agreement"), and because the text of the MOU concerning branding is not on its face inconsistent with Plaintiffs' allegation that they owned the marks they created. A license to use the Trademarks is not plainly inconsistent with a provision that delegates "branding" responsibilities to Plaintiffs. Indeed, a license to use names trademarked by Plaintiffs for the side deals – a purpose outside the one contemplated in the MOU – is completely consistent with a provision in the MOU that delegates branding for the Proposed Funds (that never came to fruition) to Plaintiffs. Branding – defined to include naming, logo, and other creative works – is a far narrower concept than ownership of intellectual property, even though the use of names is indeed what branding is all about.

Accordingly, the existence of the MOU does not by its terms prevent this court from accepting as "well-pleaded" Plaintiffs' allegations about the Oral Agreement. Whether they will ultimately prove true is another matter entirely. But at the pleading stage, when it is far from clear whether the MOU was an integrated agreement that governed every aspect of the parties' relationship – indeed, when the facts pleaded suggest that it was not – I cannot rule out the possibility that there really was an Oral Agreement. That being so, every aspect of the motion to dismiss fails; there is a dispute between the parties about every single aspect of their relationship.

There is no great need to analyze why each and every claim survives the motion. In the end, they all survive for the same reason: the outcome depends on whether the MOU was binding and for what purposes – a matter of considerable importance, since the Proposed Funds were never

ultimately raised, so Plaintiffs were never called on to perform the services contemplated by the MOU.

The motion to dismiss is denied.

**Letters Relating to the Emails**

While the court was finalizing this decision, the parties exchanged letters about emails and their attachments that Whalen retained on his laptop after he left Stellex. Defendants claim that Whalen's retention of these emails and documents violates Stellex's company policy. Defendants expressed particular concern over emails between Whalen and Greenberg, Stellex's outside counsel. (Dkt. No. 38.) Plaintiffs respond that they believe they have a right to the emails, as reflected in Count XII for conversion based on Defendants' diversion of Plaintiffs' mail and emails, freezing of their email accounts, and refusal to return their due diligence documents. Moreover, as explained above, the origin of this dispute is Greenburg's abandonment of GMR's trademark applications – allegedly at the behest of Defendants and without Plaintiffs' consent. (Dkt. No. 39.) Both parties request a briefing schedule or order of reference to Judge Wang to resolve their dispute.

Like everything else, who owns the emails and their attachments depends on who prevails on the claims asserted in this lawsuit. Therefore, it would be premature of me to order anything as to their permanent disposition.

However, the emails and their attachments indisputably constitute discoverable materials. Accordingly, I direct that Plaintiffs' counsel take immediate custody of them, and as officers of the court, hold them in trust for benefit of their clients and the court. Nothing is to be erased from the email accounts from this moment forward; and if it turns out that anything has been erased

from them since the beginning of this lawsuit, I assure the parties that a spoliation motion will be entertained.

I will be assigning discovery supervision to Magistrate Judge Ona Wang. Judge Wang is encouraged to think of creative solutions to any discovery disputes relating to the emails. I would have no objection to ordering the parties to retain, at their joint expense, a third party to take custody of the email accounts, copy the contents retained, and review that material to ensure that all discoverable "documents" are produced, and that there is a clear history of any destruction of evidence that may have taken place. But that will be up to Judge Wang in the first instance.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is DENIED. It is more appropriate to resolve the arguments Defendants raise after discovery. The parties have 120 days – and no more – to complete all discovery, at which point Defendants are free to renew their motion as one for summary judgment. Magistrate Judge Ona Wang is assigned discovery supervision.

Dated:  September 4, 2020
New York, New York

_____
Chief Judge

BY ECF TO ALL PARTIES